## WHITE CAP CO. v. OWENS–ILLINOIS GLASS CO.
### No. 11520.

United States Court of Appeals
Sixth Circuit.
April 24, 1953.

Owen & Owen, Toledo, Ohio, Davis, Hoxie & Faithfull, William H. Davis, Cyrus S. Hapgood, George E. Faithfull, New York City, Cromwell, Greist & Warden, Franklin M. Warden and Raymond L. Greist, Chicago, Ill.; George Ramsey, New York City, Paul Plunkett, Chicago, Ill., of counsel; on the brief, for appellant.

George I. Haight, Chicago, Ill., Fred E. Fuller and Frank A. Harrington, Toledo, Ohio, for appellee.

Before SIMONS, Chief Judge, and ALLEN and MILLER, Circuit Judges.

ALLEN, Circuit Judge.

This is an appeal from a judgment of the District Court dismissing a complaint in a suit for patent infringement of U. S. Patent No. 2,339,827 for "closure cap and package" granted to William P. White January 25, 1944. The patent discloses a closure consisting of a cap and gasket to be sealed upon a vessel such as a glass jar or bottle. The cap is of the type which is pressed on the vessel and is alleged to be

capable of rescaling the vessel hermetically by mere pressure. The issues of novelty, invention and infringement, as well as misuse of the patent by the plaintiff,[1] were raised in the pleadings. By consent of the parties the case was referred to a master, who filed an extensive and meticulous report of 150 pages containing findings of fact and conclusions of law. The master found for the plaintiff on the issue of novelty but recommended that the suit be dismissed upon the ground that the patent is invalid for want of invention. As to the misuse of the patent charged against the plaintiff the master found that, while plaintiff's practices with reference to licensing its sealing machines and the leases thereof constituted a violation of Section 3 of the Clayton Act, 15 U.S.C.A. § 14, plaintiff had purged itself of its illegal practices. The District Court confirmed the report and entered judgment dismissing the complaint. Claims 2 and 4, which are typical, are printed in the margin.[2]

The patent in suit had a stormy passage through the Patent Office. It was repeatedly rejected by the examiner but was finally allowed by the Board of Appeals. Certain patents and practices relied upon by the master in his findings, such as the Anchor

caps, the Armstrong caps, and those disclosed by Gilbert, No. 39,643, Coale and Greensfelder, No. 793,567, Deighton, No. 150,241, Holland, No. 1,909,406, Gibbs, No. 2,200,081, and Honiss, No. 649,843, were not before the Patent Office Board of Appeals. The Anchor caps, while not patented, have had a large use for some 35 years.

The plaintiff made the following statement with reference to the master's findings of fact:

"We have no real quarrel with the findings and statement of fact of the Master with respect to the historical background, the prior art, and the differences between the prior art and the patent in suit. We make no attack on any finding on these matters which is factual in the sense of relating to the occurrence of events or the character of previously known closures. But we do attack those findings on the issue of invention which consist of conclusions reached by the Master through his misapplication (as we submit) of 'criteria' or 'standards' of invention to these facts."

The master found, and plaintiff concedes, that all elements in the claims of the

1. Parties will be denominated as in the court below.

2. A closure for forming a frictionally retained hermetic seal on a packing vessel having a substantially cylindrical peripheral sealing surface of predetermined diameter, comprising a shell having a top portion and depending resilient annular skirt, an upper part of said skirt being formed as a constricting portion of size to encompass the sealing surface of the vessel with a clearance and the lower portion of the skirt flaring downwardly at an obtuse angle from said upper part, and a sleeve gasket of elastically deformable sealing material disposed in the shell with its peripheral surface lying against the inner surface of the skirt, said gasket being of size to receive the sealing surface of the vessel without distension but having its upper end portion circumferentially compressed and contracted within the constriction portion to a size such that its internal diameter is materially less than the outer diameter of the sealing surface of the vessel, lower marginal portions of the

skirt being curled into gripping engagement with the lower end portion of the gasket and serving to fasten the gasket securely in the shell with its upper terminus located closely adjacent the lower limit of the constricting portion in position to be further compressed in radial directions between the lower part of the constricting portion and the cylindrical sealing surface of the vessel along only a narrow circumferential sealing zone spaced from the top of the shell, whereby to form an airtight seal and retain the closure securely on the vessel by frictional gripping action of the elastic gasket and resilient skirt concentrated upon said narrow circumferential sealing zone at a distance from the top.

4. The combination of a closure as specified in claim 2 and a packing vessel having a substantially cylindrical peripheral sealing surface extending from adjacent the mouth rim of the vessel to a point farther from the mouth rim of the vessel than is the lower limit of the constricting portion from the top of the closure shell.

patent in suit were old at the time of conception. The master also found that each element performed the same mechanical function in the combination that it performed in the past outside of the combination, that the claimed invention involved no new principle not found in the prior art, and required no more than mechanical skill. These are findings of fact which were approved by the District Court. Unless clearly erroneous this court must accept them.

■ . Plaintiff contends that invention clearly exists, that the patent in suit achieves results, especially with reference to resealing of the cap, never before attained in the art, and that the master's finding of novelty and lack of invention creates a paradox. This question has been settled adversely to the plaintiff by the Great Atlantic & Pacific Tea Company v. Supermarket Equipment Corporation, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162. In that case both lower courts found that novelty existed in the questioned device but the Supreme Court held that invention did not exist.

Upon the question of invalidity plaintiff contends that the master erred in considering the Armstrong disclosures as part of the prior art because they constituted mere experiments not accessible to the public prior to the allowance of the patent in suit. The master regarded the Armstrong disclosure as closest to White 2,339,827. He said "the closure claimed by White involved no new principle not found in the prior art closures, particularly Armstrong."

Experiments carried on by the Armstrong Cork Company from January, 1934 to 1938, with a closure of the side-seal type resulted in a cap of the side-seal, press-on, friction-held type. The data secured were submitted to the legal department of Armstrong for consideration of patentability of the device developed. It was suggested that a gasket shorter than that of an earlier White patent, No. 1,807,187, be used, short enough so as not to touch the top of the cap. In a memorandum dated 1937, which dealt with the patenting of the closure, it was stressed that the closure as worked out was "more effective for reseal." On July 1, 1938, an application was filed for a patent on this closure but it was finally rejected on April 17, 1941, and the application was then abandoned. In 1946 the Armstrong Cork Company made some 40,000 of these closures, and 24,000 of them were used in commercial packing in 1947.

■ If a patent growing out of the Armstrong experiments had been issued, the Armstrong closures would have constituted part of the prior art rightly considered as bearing upon the question of patentable invention. Alexander Milburn Company v. Davis-Bournonville Company, 270 U.S. 390, 46 S.Ct. 324, 70 L.Ed. 651. But the application was rejected and the experiments were not accessible to the public. Cf. Turini v. Allens Mfg. Co., Inc., 1 Cir., 198 F.2d 491, 494. Applications which do not eventuate in patents are not held to constitute prior publication or part of the art. Walker on Patents, Deller's Edition, Vol. 1, page 136. In Western States Machine Co. v. S. S. Hepworth Co., 2 Cir., 147 F.2d 345, Judge Learned Hand declared that a patent eventually allowed was part of the prior art. The applications considered in Detrola Radio & Television Corporation v. Hazeltine Corporation, 313 U.S. 259, 61 S.Ct. 948, 85 L.Ed. 1319, which stated that applications in the Patent Office constituted prior art, doubtless were allowed. No case is cited and our study has shown none in which this rule has been extended to patent applications finally rejected.

But this conclusion that Armstrong was erroneously included in the pertinent prior art does not affect the soundness of the holding on lack of invention, which was based on other patents and practices besides that of Armstrong. The field was crowded, the patent in suit was an improvement patent, and every element in it was old. The use of the locked-in sleeve gasket and of the formation of the friction seal on a narrow area of the jar, at a distance below the top, particularly emphasized by plaintiff, were shown in various prior patents. We mention only a few of these in view of the exhaustive findings of the master. The sleeve gasket disclosed in plaintiff's closure was shown in the Anchor devices, in White, 1,807,187, and in White Cap British Patent, 468,656, prior to the patent in suit. The

choice between different types of gaskets known to the art, as plaintiff's expert agreed, was for the ordinary mechanic. The substitution of the sleeve gasket for the disc gasket did not involve invention. Dow Chemical Company v. Haliburton Oil Well Cementing Company, 324 U.S. 320, 65 S.Ct. 647, 89 L.Ed. 973.

In Coale & Greensfelder, No. 793,567, the "packing-ring" (i. e., the lip of the gasket) is located, as the specifications state, "at some distance below" the top of the cap. As to the White Cap British Patent 468,656, plaintiff's counsel stated that "if this gasket were locked in, it would be the patent in suit." The specifications state that the upper end of the gasket "is spaced a substantial distance from the top of the closure shell." A similar feature is shown in Schram, 933,122. That is, these three prior disclosures teach formation of the friction seal on a narrow area of the jar at a distance from the top, the feature upon which the Board of Patent Appeals reversed the examiner's reiterated rejection of the application for the patent in suit. The Anchor cap has been on the market since 1916 and its style has never been changed. It is a side-seal closure and utilizes a locked-in gasket. Originally it was applied by a chuck. As a result the cap was injured upon removal so that it could not be resealed. When the press-on sealing machines were developed the Anchor cap was usable for resealing. Plaintiff's witness and vice president testified that the Anchor cap gives a "perfect" seal and "does a very good job of re-sealing." The Anchor disclosure is clearly pertinent with reference to the asserted invention.

The plaintiff leans heavily upon evidence of invention asserted to exist in new and long sought for results achieved by the patented device, particularly in resealing, which closures of the free gasket type were unable to secure. This is especially true, it claims, with products such as catsup and peanut butter, in which the moisture or the oily character of the product creates a special problem for the effective resealing of the cap. Plaintiff says that the White cap, which is the commercial device of the patent in suit, has superseded the old free gasket caps. Impressive figures of gains in the sales of caps under the patent in suit are quoted, which plaintiff attributes mainly to the improved resealing qualities of its device. Evidence was adduced supporting this view, which was not adopted by the master.

The increased use in the canning industry of glass vessels and of capping machines, which make economical and feasible the use of the pressure caps, the master found was an important factor in the increase of sales. This finding is clearly correct, for plaintiff's own testimony contradicts its assertion that the cap of the patent in suit achieved a new result amounting to invention. Plaintiff's previous White patents, No. 1,590,787 issued June 29, 1926, and No. 1,807,187 issued May 26, 1931, each employed a free gasket and caps were manufactured and sold extensively under these patents. The caps were applied by overhead pressure which provided a hermetic seal and were capable of resealing by being pressed into position. Caps made under the previous White patents were widely advertised as having the feature of hermetic resealing. In its advertising plaintiff called its "Vapor-Vacuum" caps "easy-to-open," "easy-to-reseal," "closures that are easy to open—and just as easily hermetically resealed." Of the "White Cap" it said that it "forms a hermetic re-seal when pressed back on the container." This result was obtained, it said, in closures for "catsup." These claims of resealing results secured on caps made under its earlier White patents contradict plaintiff's present assertions and support the finding of the master that the claimed invention involves no new principle, and requires no more than mechanical skill.

As to the misuse of the patent we think that the master correctly found that the plaintiff had purged itself of its illegal practices. This situation arose out of the following facts found by the master:

"Plaintiff admits that from 1926 to 1940 plaintiff did include in its leases of sealing machines a clause which, if enforced, would require lessees to use only plaintiff's caps; that in 1940 and 1942 there was a clause which, if en-

forced; would require lessees to use caps 'approved' by plaintiff; and that after 1942 plaintiff's leases of sealing machines contained a clause in which the plaintiff's agreement to indemnify lessees in the event of their being held liable for infringement was limited to instances of the use of the machines with plaintiff's caps, but says that in October of 1947 that condition on indemnification was cancelled."

That modification was made "pursuant to legal advice and during the pendency of the action."

"Plaintiff's vice-president admitted on cross examination that plaintiff would lose money on the leasing of its sealing machinery were it not for the sale of caps to its lessees, and that it is; and always has been, the plaintiff's desire that its sealing machines be used to seal its caps."

"There are 755 sealing machines leased by plaintiff, of which 592 are vapor-vacuum sealing machines. It was estimated by plaintiff's vice-president in charge of sales that plaintiff currently sells and for a number of years has sold approximately 25 per cent to 33⅓ per cent of all caps sold in the United States for glass containers for food products. During the period 1938 to 1946, plaintiff's gross sales totaled $57,867,000. During the same period, plaintiff's gross sales of caps to persons who did not lease the sealing machinery were $406,559. During that period over 99 per cent of dollar value of plaintiff's caps were sold to lessees of its sealing machinery."

The master concluded:

"with regard to licensing its patented sealing machines and the tying in conditions of its leases with the agreement that the lessees use the machines only with caps supplied, authorized or approved by the lessor, and the discriminatory indemnification clause in its current lease, all with the apparent purpose and intent of requiring the lessees of the machines to purchase their caps of the plaintiff, naturally and necessarily tended to substantially lessen competition in caps for use in such machines and constitute a violation of Sec. 3 of the Clayton Act; that such practices are against public policy and the public interest; and that when plaintiff came into this court as a court of equity to enforce the patent in suit it did not come into court with 'clean hands.' "

In the absence of conduct amounting to a renunciation of the illegal practices the master concluded that the equity court would withhold relief because of the use of the patent privilege contrary to the public interest. Mercoid Corporation v. Mid-Continent Investment Company, 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376.

However, the master held that the plaintiff had purged itself of the illegal practice. The fact that the objectionable provision was cancelled during the pending proceedings does not establish that the holding is erroneous. Campbell v. Mueller, 6 Cir., 159 F.2d 803. See also Standard Oil Company v. United States, 283 U.S. 163, 51 S.Ct. 421, 75 L.Ed. 926, in which the illegal clauses were cancelled a short time before entry of the decree.

Defendant claims that this holding is erroneous for the reason that the plaintiff has not shown that the consequences of the misuse of the patent have been dissipated, Morton Salt Company v. G. S. Suppiger Company, 314 U.S. 488, 493, 62 S.Ct. 402, 86 L.Ed. 363, and urges that the mere act of cancelling the objectionable clause of the lease does not of itself constitute a purge. However, it does not appear that plaintiff was called upon to indemnify any lessee because of threatened action. It was also shown that many of plaintiff's customers used caps of competitors, at times with plaintiff's assistance. There is no evidence that any lessee was ever affected in his choice of caps by the indemnification clause. Under such circumstances it was unnecessary for the plaintiff to prove that the consequences of the misuse had been dissipated because it was not shown that the misuse had illegal consequences. Westinghouse Electric Corporation v. Bulldog Electric

Products Company, 4 Cir., 179 F.2d 139, 146; Automatic Radio Manufacturing Company, Inc., v. Hazeltine Research, Inc., 339 U.S. 827, 831, 70 S.Ct. 894, 94 L.Ed. 1312.

The matter of costs rests in the sound discretion of the court. We think it was not an abuse of discretion to divide the costs. Moreover, this conclusion was embodied in the judgment to which the defendant has prosecuted no appeal. It therefore cannot challenge the decision.

The judgment of the District Court is affirmed.