**ZENITH RADIO CORPORATION,**
**Appellant,**

**v.**

**David L. LADD, Commissioner of**
**Patents, Appellee.**

**No. 16820.**

United States Court of Appeals
District of Columbia Circuit.

Argued May 10, 1962.

Decided Nov. 8, 1962.

Mr. Francis W. Crotty, Chicago, Ill., with whom Mr. Homer R. Montague, Washington, D. C., was on the brief, for appellant.

Mr. S. Wm. Cochran, Atty., U. S. Patent Office, with whom Mr. Clarence W. Moore, Sol., U. S. Patent Office, was on the brief, for appellee.

Before EDGERTON, WASHINGTON and BURGER, Circuit Judges.

WASHINGTON, Circuit Judge.

This is an appeal from a judgment of the District Court, entered in a suit brought under Section 145 of Title 35 of the United States Code (1958), refusing to grant relief from a determination of the Patent Office denying reissue of Patent No. 2,870,521, originally issued to Norman Rudnick.

Appellant, Zenith Radio Corporation, the plaintiff below, is assignee of the patent, which covers a method of adjusting the resonant frequency of a longitudinal-mode transducer. A transducer is a device that changes energy from one form to another. It is of the "longitudinal-mode" type when its operation involves, in effect, a periodic lengthening and shortening of the device in the direction of its longitudinal axis. While transducers may perform a variety of functions and are not necessarily of uniform shape or construction, the particular type involved in the present controversy consists of a cylindrical rod designed so that, when struck with a hammer or other instrument, it will emit ultrasonic waves at a precisely determined frequency. The chief commercial use of such transducers appears to be in connection with a system for remotely controlling the operation of a television receiver.

Appellant holds patents covering many of the important aspects of its remote control system, and a number of these have been held valid in litigation elsewhere. Zenith Radio Corp. v. Admiral Corp., 190 F.Supp. 41 (W.D.Okl.1960), affirmed, 296 F.2d 708 (10th Cir., 1961). One of the difficulties faced by appellant in developing its system, and overcome by the process described in the Rudnick patent, involved adjusting the resonant frequency of the transducers with the necessary degree of precision. The frequency of a longitudinal-mode transducer may be increased by reducing its length. Decreasing the frequency presents a more difficult problem. One of the solutions

to the problem, which is embodied in the claim presently before us,[1] involves "cutting at least one hole" at the longitudinal center, or nodal plane, of the rod, the resonant frequency decreasing in proportion to the number of holes and the amount of material removed.

This proceeding has a fairly complicated history, which will be summarized here very briefly. Zenith acquired the Rudnick patent shortly after it was issued. At that time, the scope of the patent was considerably broader than that of the present claims, encompassing the removal of material from the nodal plane by means of a groove as well as by means of a hole or holes, and also covering a method of raising the resonance frequency. For reasons not here material, Zenith applied for reissue of the patent with somewhat broadened claims. While this application was pending, however, it was discovered that much of what was disclosed by the Rudnick patent was already public information as a result of an article published in 1928 by Professor George W. Pierce.[2] Pierce described his method of adjusting the frequency of magnetostrictive rods, which for our purposes are similar to longitudinal-mode transducers, as follows:

"A rod can be predetermined and cut in a lathe to 0.01 cm. so that the final frequency adjustment to a standard value requires very little grinding. The end is ground off to raise the frequency. If too much is ground off at the end, it can be corrected by grinding away a little from the girth near the center of the rod."

In light of the Pierce disclosure, Zenith submitted an amendment to its reissue application restricting the claim to that presently before us: "cutting at least one hole" at the nodal plane of the rod. The Patent Office Examiner rejected the reissue application for want of invention, relying mainly on the Pierce reference and on his conclusion that removal of material by means of drilling was obvious from the prior art and did not represent a method patentably different from removal by grinding. His determination was affirmed by the Board of Patent Appeals. Zenith elected to seek further review by means of a de novo proceeding in the District Court under the provisions of 35 U.S.C. § 145 (1958), seeking a decree that it was entitled to reissue of the Rudnick patent as amended.

The only witness appearing in the proceeding in the District Court was an expert called by Zenith, who testified that Rudnick's teaching would not have been obvious to one skilled in the art. This conclusion was largely based on the witness' opinion that the claim in question calls for the asymmetrical removal of material, whereas (he said) the art had previously understood, and Pierce's article did not suggest otherwise, that material must be removed symmetrically from a distributed-constant device[3] lest the performance of the device be adversely affected. The witness further testified that experiments he had conducted dem-

---

1. The sole claim at issue is as follows: "The method of manufacturing a longitudinal-mode transducer having an accurately predetermined resonant fundamental frequency which comprises: fabricating an elongated cylindrical transducer element having an actual longitudinal-mode resonant fundamental frequency slightly higher than said predetermined fundamental frequency; and cutting at least one hole, of round cross-section and of a diameter small with respect to that of said element and with its axis lateral to the longitudinal axis of said element, into an intermediate portion of said element coincident with and substantially within a nodal plane for longitudinal-mode vibrations at said fundamental frequency to remove material in an amount substantially sufficient to reduce its resonance frequency from said actual fundamental frequency to said predetermined fundamental frequency."

2. Pierce, Magnetostriction Oscillators, Proceedings of the American Academy of Arts and Sciences, Vol. 63, No. 1, pp. 1, 8 (April, 1928).

3. The transducer in question was said by the witness to be such a device.

onstrated the impracticality of the technique described by Pierce and the simplicity and utility of Rudnick's method. On cross-examination he stated that, as a general matter, if one were given the choice between grinding (the method mentioned by Pierce) and drilling as a way to remove precise small amounts of metal from a bar, drilling would be "more practical by a great margin."

The District Judge, in dismissing the complaint, did not specifically advert to the expert testimony, but stated in his findings of fact that "No evidence has been presented which shows that the Patent Office was clearly in error in holding that it would fall within the skill of the art to effect the material removing operation in Pierce by the drilling or cutting of a round hole." He further concluded, as a matter of law, that "An applicant for reissue is not in a favorable position to assert that there is patentable invention in one of several originally disclosed alternatives when the disclosure suggests that the alternatives are a mere matter of choice, and the asserted patentable distinction is, therefore, an afterthought."

■ On this appeal, a threshold contention is made by Zenith that the District Court did not conduct the proceeding as a trial "de novo." True it is that a suit under Section 145 of Title 35 is to be "prepared and heard upon all competent evidence adduced and upon the whole merits." See Butterworth v. United States ex rel. Hoe, 112 U.S. 50, 61, 5 S.Ct. 25, 30, 31, 28 L.Ed. 656 (1884); Hoover Co. v. Coe, 325 U.S. 79, 83, 65 S. Ct. 955, 957, 89 L.Ed. 1488 (1945). But the record before us does not indicate that the District Court departed from that standard.

■ There was no evidence offered by Zenith that was excluded by the trial judge. Zenith does not rely on anything indicating prejudice to its rights, but on a colloquy between the trial judge and counsel for the Patent Office (Mr. Cochran), in the course of which the judge indicated a reluctance to consider other legal grounds tendered by the Patent Office as additional reasons for denying reissue of the Rudnick patent, and Mr. Cochran acquiesced.[4] We need not now decide whether the Patent Office may defend in a Section 145 proceeding on grounds other than those on which it relied in refusing to issue the patent. That is not involved in this case. Zenith had full opportunity to introduce its evidence bearing on the issue of patentability, and we find no basis for surmising that the trial judge disregarded his duty to make an independent evaluation of the evidence before him. If, in making this evaluation, the trial judge placed great weight on the findings of the Patent Office, this was in full accord with the directions of this court, at least in the absence of new evidence carrying "thorough conviction" that had not been considered by the Patent Office. Esso Standard Oil Co. v. Sun Oil Co., 97 U.S. App.D.C. 154, 157, 229 F.2d 37, 40, cert. denied, 351 U.S. 973, 76 S.Ct. 1027, 100 L.Ed. 1491 (1956).

■■ Zenith's point seems to be that because it introduced testimony which was consistent and uncontradicted, that testimony should control. However, as we have frequently stated, the findings of the Patent Office, an expert administrative body, especially when confirmed by the District Court, will not be overturned here unless clearly infected with error. See, e. g., Hendrix v. Ladd, 112 U.S.App. D.C. 203, 205, 301 F.2d 527, 529 (1962);

---

4. At an earlier stage, the following colloquy had occurred:

"Mr. Cochran: I think you should consider the case in the framework of all of the relevant evidence that we can bring to bear on the problem. This is a trial de novo.

"The Court: Yes, of course you are right as to that. Very well, you may proceed."

Reading the record as a whole, we think the District Judge clearly understood the nature of the proceeding and his own duties in relation to it.

Esso Standard Oil Co. v. Sun Oil Co., supra; Abbott v. Coe, 71 U.S.App.D.C. 195, 197–198, 109 F.2d 449, 451–452 (1939). And it is very commonly the case, in proceedings brought under Section 145, that the only live testimony given in the District Court directly supports the applicant's claim and is not contradicted by other testimony in that proceeding. But that does not mean that the live testimony is controlling. It must still be weighed against the other materials in the case—most importantly, the record made in the Patent Office, the prior art, and the conclusions of the Primary Examiner and the Board of Patent Appeals, all of which are normally placed before the District Court in documentary form.

▌ In this court, appellant relies most heavily on the expert's testimony, summarized above, concerning the asymmetrical removal of material by Rudnick's method. But the claim and specifications do not expressly teach or disclose that such removal is or must be asymmetrical. In fact, drawings submitted with the application show what appears to be a symmetrical arrangement of holes around the girth of the transducer. Under the circumstances, appellant's contention that the asymmetrical feature constitutes patentable invention is not persuasive. Cf. Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 59 S.Ct. 8, 83 L.Ed. 34 (1938); O'Brien v. Watson, 104 U.S.App.D.C. 407, 262 F.2d 718 (1958).

It is to be noted also that the allegedly asymmetrical feature of Rudnick's technique was apparently not relied on by Zenith before the Primary Examiner or in the initial proceedings before the Board of Patent Appeals. Mention of it seems to have been first made in an affidavit by J. Kelly Johnson, the expert who testified in the District Court, which was submitted to the Board together with a petition for reconsideration of its decision. The affidavit set forth substantially the same material as that contained in Johnson's testimony before the District Court, and was fully considered by the Board. After canvassing the petition and the affidavit, the Board refused to change its holding, saying:

"In the light of the very filing of the petition, however, we have reviewed our decision, but upon such review we find our holding to be sound and that any variation therein would not be warranted. In this connection, to the extent that appellant's comments contained in the petition paper may be taken as argument pertaining to the interpretation of the Pierce article, we regard the description in said article of 'grinding away a little from the girth near the center of the rod' as in no way restrictive to a circularly symmetrical removal of material, but essentially as constituting affirmative disclosure inclusive of circularly unsymmetrical removal of the material involved. In this respect, appellant's assertions in the petition paper relating to lack of expectancy by one of ordinary skill in the art of other than a circularly symmetrical removal of materials would appear to find refutation in the Pierce article."

We may add that asymmetry, whether or not in fact it is inevitably produced, would appear to be an incidental effect, and not the essence of the Rudnick process. At any rate, the point was raised before the Board of Patent Appeals in substantially the same terms as before the District Court, and rejected for reasons which are not arbitrary, capricious or unwarranted.

▌ On the whole case, we are not convinced that the District Judge erred in his assessment that the method of manufacturing taught by Rudnick is not a patentable invention when set against the Pierce disclosure. For these reasons, the judgment of the District Court will be

Affirmed.