**John F. CODY et al.**

v.

**AKTIEBOLAGET FLYMO et al.,**
**Appellants.**

**No. 23575.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 14, 1970.

Decided Sept. 9, 1971.

Petition for Rehearing Denied
Nov. 2, 1971.

Certiorari Denied March 20, 1972.
See 92 S.Ct. 1254.

Christensen, District Judge, dissented and filed opinion.

77. *Id.*

78. 394 U.S. 165, 174, 89 S.Ct. 961, 967, 22 L.Ed.2d 176 (1969).

79. 403 U.S. 388, 424, 91 S.Ct. 1999, 2018, 29 L.Ed.2d 619 (1971) (dissenting opinion).

Messrs. Laurence R. Brown, Washington, D. C., and John H. Lewis, Jr., Arlington, Va., for appellants.

Messrs. George M. Hopkins, Atlanta, Ga., and Edwin L. Reynolds, Washington, D. C., for appellees. Mr. Lawrence L. Colbert, Washington, D. C., also entered an appearance for appellees.

Before McGOWAN and ROBINSON, Circuit Judges, and CHRISTENSEN,* United States District Judge, District of Utah.

McGOWAN, Circuit Judge:

This is an appeal from a reversal by the District Court in a patent interference case of a ruling of the Board of Patent Interferences. We are confronted on this appeal with difficult questions regarding both the procedural propriety of the District Court's decision, and, given the applicable burden of proof and standard of review, the sufficiency of appellees' proof of reduction to practice. We are also called on by appellants to decide two issues, resolved neither in the Patent Office nor in the District Court, relating to the patentability of appellees' invention. For the reasons stated below, we affirm the judgment of the District Court, 306 F.Supp. 728.

I

Appellants are Aktiebolaget Flymo, a Swedish corporation, and Karl R. Dahlman, an inventor and himself a resident of Sweden. Appellees John Cody and George Sites are the inventors of one of the devices in question in this case. That invention, claimed by both parties, is a wheelless lawnmower sustained at the appropriate level above the ground on a thin cushion of air. Appellants filed their patent application on March 12, 1962 and, because they were the first to file on the device, took on the status of "senior party" in these proceedings. Appellees, the "junior party" herein, filed their application on November 7, 1962, some seven months after appellants' filing. On November 19, 1963, while the applications were co-pending, the Patent Office awarded a patent to appellants.

Several months thereafter, in conformance with applicable procedures for creating an interference, appellees amended their original application. Claiming that their device fitted the descriptions of appellants' invention, they copied thirteen claims from the recently issued patent and requested that interference proceedings be instituted. On March 18, 1965, following the additional filing by appellees of several necessary supplemental affidavits, the Examiner of Patent Interferences declared an interference as to three of the thirteen claims. Those claims, constituting the pertinent counts in interference, are reprinted in the margin.[1]

---

* Sitting by designation pursuant to 28 U.S.C. § 292(c).

1. Count No. 1 (Appellants' Claim No. 2 from patent; Appellees' Claim No. 13 from amended application):

"A grass cutting machine comprising a housing having a bottom opening, the peripheral edge of which is located substantially in a plane, a rotary air impeller mounted on a shaft in said housing, a rotary cutter mounted in said housing below said air impeller on the same shaft, and driving means for said rotary air impeller and said rotary cutter, said air impeller being constructed to expel air through said bottom opening along paths and at rates suitable for slightly elevating said housing and parts carried thereby from the ground by ground effect."

Count No. 2 (Appellants' Claim No. 5 from patent; Appellees' Claim No. 16 from amended application):

"A grass cutting machine comprising a hood having a top cover portion and a skirt portion, the latter being substantially shaped as a vertically disposed cylinder terminated at its bottom with a supporting rim, a motor attached to said top cover portion, said motor having a vertical shaft extending into the space within said skirt portion, an air impeller mounted on said shaft, a rotary cutter mounted on said shaft below said air impeller, an air inlet opening disposed centrally of said top cover portion, said air impeller being constructed to suck in air through said air inlet opening and to expel air through the open bottom of said hood at a rate sufficient to slightly elevate the assembly

The central issue between the parties, as in all patent interferences, was whether the one or the other was the original inventor of the grass-cutting machine. Resolution of that issue depends upon the determination as to which party first, in point of time, reduced his invention to practice. Appellants relied on March 16, 1961, the date on which their invention had been made the subject of a patent application in Sweden, as their earliest date of constructive reduction to practice.[2] Appellees, seeking to best appellant's showing, relied on tests conducted in the spring and fall of 1960 as evidencing a prior reduction to practice. It was upon the sufficiency of their showing on that score that the question of priority turned.

■ As the junior party in interference, appellees' burden before the Board of Patent Interferences was to establish their claim of prior reduction to practice by a preponderance of the evidence.[3] Consistent with the standard practice in such proceedings, all of appellees' evidence was submitted in deposition and exhibit form. 37 C.F.R. §§ 1.251–57, 1.271–81 (1971). Although appellants submitted no direct evidence, their counsel was present when depositions were being taken and briefly cross-examined several of appellees' witnesses. After hearing oral argument, the Board of Patent Interferences held in appellants' favor on March 23, 1967. The Board's findings emphasized that appellees had failed to demonstrate that the lawnmower they built in 1960 operated in an acceptable manner for its intended purpose, i. e., they failed to meet their burden of proof on the question of priority. The Board reaffirmed its position two months later in a short opinion denying appellees' request for reconsideration.

Faced with the statutory alternatives of appealing the Board's ruling to the Court of Customs and Patent Appeals[4] or bringing a civil action in the District Court,[5] appellees elected to pursue the latter course. Following the filing of the law suit, and after the passage of nearly two years of preliminary sparring between the parties, appellees filed a motion for summary judgment. Appellants opposed the motion and file a summary judgment motion of their own, requesting, in the alternative, that the court either affirm the Board or, if it were to conclude that the junior party had met his burden before the agency, to consider appellants' two claims that the device in question was not patentable to appellees in any event. By Memorandum Opinion dated June 19, 1969 and Order of Judgment dated July 7, 1969, the District Court granted appellees' motion, reversed the Board, and remanded the case. The court refused to pass on the two patentability questions raised by appellants on the grounds that they had not been "developed in any detail before the Board" and that such matters were not within the scope of review of ques-

---

of said hood, motor air impeller and rotary cutter from the ground by ground effect."
Count No. 3 (Appellants' Claim No. 12 from patent; Appellees' Claim No. 23 from amended application) :
"A wheelless grass cutting machine having a power operated rotary cutter and commonly driven air impelling means for producing ground effect to support said machine on a cushion of air at a distance above the ground."

2. The procedure for relying on a foreign application is set out in Rule 216(c) of the Patent Office Rules of Practice, 37 C.F.R. § 1.216(c) (1971). See A. Deller, Walker on Patents § 204, at 925 (1st ed. 1939).

3. The rules regarding burdens of proof in such proceedings in the Patent Office are well established. If the junior party files his application *after* the patent is awarded to the senior party he must demonstrate his reduction to practice beyond a reasonable doubt. If, as was the case here, the junior party files his application *before* a patent issues to the senior party, the customary preponderance test applies. *See, e. g.,* Conner v. Joris, 241 F.2d 944, 946, 953, 44 CCPA 772 (1957) ; St. Pierre v. Harvey, 233 F.2d 337, 338, 43 CCPA 918 (1956).

4. 35 U.S.C. § 141 (1964).

5. 35 U.S.C. § 146 (1964).

tions of priority of invention.[6] This appeal followed.

## II

Before addressing ourselves to the substantive issues—priority and patentability—in this case, we consider two preliminary questions. First, what measuring rod or standard of review has been established to guide the district courts in scrutinizing the Board's actions in these somewhat unusual *de novo* proceedings? Second, given that standard of review, can disposition, short of a full evidentiary hearing, by way of summary judgment ever be appropriate in a case in which the Board's conclusion is to be overturned?

A Supreme Court precedent, which has been consistently applied by the federal courts in reviewing the Board's interference rulings for over seventy years, provides the cornerstone for our consideration of the first question. In Morgan v. Daniels, 153 U.S. 120, 125, 14 S.Ct. 772, 773, 38 L.Ed. 657 (1894), the Court in a unanimous opinion held:

> "Upon principle and authority, therefore, it must be laid down as a rule that, where the question decided in the patent office is one between contesting parties as to priority of invention, the decision there made must be accepted as controlling upon that question of fact in any subsequent suit between the same parties, *unless the contrary is established by testimony which in character and amount carries thorough conviction.*"

(Emphasis supplied.) The applicability of this "thorough conviction" standard to the district court's deliberations in such cases can hardly be questioned.[7] Appellants acknowledge that standard, and argue that it was not satisfied here, and indeed can never be satisfied in the absence of the presentation in the district court of *new evidence* not previously

considered by the Board. Stated differently, the argument is that the Board's factual conclusions in an interference proceeding are conclusive on the district court if the dissatisfied party elects, as here, to rely on the record made before the Board.

The notion that a new-evidence test inheres in *de novo* review proceedings finds its source in the statutorily established alternate routes of appeal open to a party dissatisfied with a Patent Office decision. He may either appeal to the Court of Customs and Patent Appeals, 35 U.S.C. §§ 141–144, or file a civil action in the district court, 35 U.S.C. § 146. Should he do the former, the statute makes clear that the Court of Patent Appeals "shall hear and determine such appeal *on the evidence produced before the Patent Office.*" 35 U.S.C. § 144 (emphasis supplied). When one chooses to proceed in the district court, however, his proof may carry him well beyond the confines of the administrative record.

It is this difference regarding the comparative scope of the matters the two tribunals may consider which meaningfully distinguishes the one from the other, and often is the determinative factor in the dissatisfied party's choice of forum. That this factor lies at the center of the differences between the two alternatives is evidenced by the Supreme Court's discussion in Hoover Co. v. Coe, 325 U.S. 79, 83, 65 S.Ct. 955, 957, 89 L.Ed. 1488 (1945):

> "It is evident that alternative rights of review are accorded an applicant,— one by appeal to the United States Court of Customs and Patent Appeals, and the other by bill in equity filed in one of the federal district courts. In the first the hearing is summary and solely on the record made in the Patent Office; in the other a formal trial is afforded on proof which *may* in-

---

6. Cody v. Aktiebolaget Flymo, 306 F.Supp. 728 (D.D.C.1969) (*see* note 19 *infra*).

7. *See, e. g.*, United States v. Szuecs, 100 U.S.App.D.C. 24, 240 F.2d 886 (1957);

Radio Corp. of America v. International Standard Elec. Corp., 232 F.2d 726, 729 (3d Cir. 1956).

clude evidence not presented in the Patent Office." (Emphasis supplied.) In its examination of the legislative history of these review statutes, the Court noted that in 1927 an effort was made in Congress to abolish one alternative or the other but that it proved unsuccessful, thus "saving to litigants the option of producing new evidence in a court, by retaining the equity procedure." *Id.* at 87, 65 S.Ct. at 959.

As a practical matter there would appear to be little incentive for a party to come into the district court unless he contemplated a further evidentiary presentation. Initially, as reflected in the following exchange between court and counsel at the summary judgment hearing, that consideration seems to have occasioned appellees' decision to come into the District Court in this case:

> "[COUNSEL FOR APPELLEES]" I asked for reconsideration * * * and was refused. * * * Then I took an appeal to the District Court for the District of Columbia. I contemplated going to the Court of Customs and Patent Appeals, but since I could put on additional proof as to the fact that this machine was cutting grass all over—
>
> "THE COURT: Yes, that is why we get a lot of them.
>
> "[COUNSEL]: I came to you folks.
>
> "THE COURT: I understand that." [8]

We can only speculate as to the circumstances that led appellees to change their tack and to rely on the administrative record, but, whatever those reasons might have been, we doubt the wisdom of a rule that would either force them

to go to trial and produce new evidence or to suffer the conclusive resolution against them of all questions of fact.

We find that *Morgan v. Daniels* itself stands as direct refutation of the theory that the presentation of new evidence is a prerequisite to the trial court's consideration of whether the Board's factual conclusions are erroneous. That case is similar to our own in that no evidence was presented to the court there that had not been brought out in the interference proceeding. *Id.* 153 U.S. at 122, 14 S.Ct. 772. Nevertheless, the Court did exactly what appellants argue the District Court in our case was without authority to do—it examined *all* the evidence and measured its sufficiency under the "thorough conviction" test. The language of the Court's concluding paragraph is particularly instructive:

> "It is enough to say that the testimony *as a whole* is not of a character or sufficient to produce a clear conviction that the patent office made a mistake in awarding priority of invention to the defendant."

*Id.* at 129, 14 S.Ct. at 775 (emphasis supplied). The implication is unmistakably clear that had that evidence carried thorough conviction—even though none of it was "new evidence"—the Patent Office's ruling would have been overturned.

Appellants have relied on several cases in this jurisdiction in support of their contention that an evidentiary showing going beyond that presented before the Board is essential.[9] In none of those cases, however, was the failure to produce new evidence the determinative factor, *i. e.*, those cases cannot be read to

---

8. Appellants, focusing on this brief exchange, have argued that it demonstrates that appellees were, in essence, subverting the administrative process by withholding relevant evidence from the Board and then planning to introduce it later in the trial court. While we agree that parties must not be permitted to raise new issues or to submit evidence omitted at the agency level out of negligent disregard for the administrative process, we do not place so sinister an interpretation on appellees'

conduct here. *See* DeSeversky v. Brenner, 137 U.S.App.D.C. 369, 424 F.2d 857 (1970).

9. Pro-Col Corp. v. Commissioner of Patents, 141 U.S.App.D.C. 142, 436 F.2d 296 (1970); National Distillers & Chem. Corp. v. Brenner, 128 U.S.App.D.C. 386, 389 F.2d 927 (1967); Hays v. Brenner, 123 U.S.App.D.C. 96, 357 F.2d 287 (1966); Zenith Radio Corp. v. Ladd, 114 U.S.App.D.C. 54, 310 F.2d 859 (1962).

hold that, but for the absence of new evidence, the court might have reversed the Patent Office. Those were all cases, to the contrary, in which nothing presented to the district court—either old or new was supportive of a conclusion that, under the thorough conviction standard, the Board had erred. More importantly, all of those cases purport to rely on this court's discussion of the *Morgan v. Daniels* test in Esso Standard Oil Co. v. Sun Oil Co., 97 U.S.App.D.C. 154, 158–159, 229 F.2d 37, 41–42 (1956), cert. denied, 351 U.S. 973, 76 S.Ct. 1027, 100 L.Ed. 1491 (1956). We, too, rely on that case and find its language dispositive of the case before us.

*Esso* was an appeal from a Patent Office ruling in a trademark case in which the only substantial issue was whether two trademarks were confusingly similar. The Patent Office held that they were confusingly similar, but upon *de novo* review in the district court that decision was reversed. After establishing that the thorough conviction standard of review applied in such cases, this court reviewed all the evidence and concluded that neither the new evidence nor the evidence of record before the Patent Office supported the district court's decision.

"We find no basis, therefore, for the action of the trial court in overturning the ruling of the Patent Office. Certainly there was no evidence to the contrary which 'carries thorough conviction,' as the Supreme Court has told us there must be. Morgan v. Daniels, supra. The evidence before the District Court was the same as that before the Patent Office, except for certain additional evidence 'not of a kind to change the result.' * * * In such a case, the Patent Office ruling should normally be followed. *Of course, if the decision of the Patent Office is not warranted on the evidence before it,* or if the new evidence reaches the necessary standard, the District Court may rule as the totality of the evidence may require. But the present is not such a case.'

97 U.S.App.D.C. at 158–159, 229 F.2d at 41–42 (emphasis supplied).[10] It should be clear, then, that the failure to introduce additional evidence cannot, by the force of that circumstance alone, be conclusive against the party challenging the Board, and it should further be apparent that the thorough conviction inquiry must focus on the whole record.[11]

■ Given this standard of review, the second related question—whether the dissatisfied party may attempt to meet that burden in a summary judgment proceeding—raises no difficulties. We are unable to find fault with the use of summary judgment under the peculiar circumstances presented in cases like the one before us. The only factual issue in dispute was the ultimate question

10. *See, e. g.,* California Research Corp. v. Ladd, 123 U.S.App.D.C. 60, 65, 356 F.2d 813, 818 (1966); Pierce v. Watson, 107 U.S.App.D.C. 226, 228, 275 F.2d 890, 892 (1960); Potter Instrument Co. v. Mohawk Data Sciences Corp., 309 F. Supp. 866, 867 (S.D.N.Y.1969) (Patent Office record forms the "nucleus of the evidence before the District Court," but "additional evidence may be submitted").

11. We are fortified in our conclusion on this score because of the serious opportunity for injustice present under appellants' new-evidence theory. The two alternative review provisions discussed above, in addition to permitting the dissatisfied party to choose his forum in the first instance, also provide that, if the dissatisfied party appeals to the Court of Customs and Patent Appeals, his adversary has the power to demand that the case be heard instead by the district court. 35 U.S.C. § 141 (1964). Essentially that proviso means that the appellee in an interference review can *compel* the dissatisfied party to seek *de novo* review in the district court. *See* Tibbetts Industries, Inc. v. Knowles Electronics, Inc., 386 F.2d 209, 212 (7th Cir. 1967), cert. denied, 390 U.S. 953, 88 S.Ct. 1046, 19 L.Ed.2d 1146 (1968). Under appellants' theory, if the dissatisfied party wished only to challenge the propriety of the Board's findings on the record and had no new material to proffer, he could not prevail. Therefore, by effecting a change of forum, the appellee could impose a higher, and in some cases insurmountable, standard of review.

whether appellants' showing constituted an actual reduction to practice. Neither party had additional testimony or tangible evidence that he wished to present to the court.[12] Although appellants opposed appellees' motion for summary judgment, they did not contend that there were material issues of fact in dispute, but simply contended that appellees, relying as they were on the Patent Office record, had not met their burden of proof on the critical issue of priority. Certainly nothing that eventuated during the hearing before the district judge could have alerted him to any existing opposition to his resolution of the merits of the case on the basis of the material before him.[13]

With the case in this posture our holding in Fox v. Johnson & Wimsatt, Inc., 75 U.S.App.D.C. 211, 218–219, 127 F.2d 729, 736–737 (1942), would seem to bear conclusively on this question.

> "There was conflict concerning interpretation of the facts and the ultimate conclusion to be drawn from them * * *. But there was none as to the facts themselves. In other words, the evidentiary facts were not substantially in dispute. * * * Conflict concerning the ultimate and decisive conclusion to be drawn from undisputed facts does not prevent rendition of a summary judgment, when that conclusion is one to be drawn by the court. The court had before it all the facts which formal trial would have produced. Going through the motions of trial would have been futile."

*See also* 3 Barron & Holtzoff, Federal Practice & Procedure § 1234, at 128 (1958).

### III

■ On the merits of the reduction to practice issue we have reviewed the record and find that, under the applicable thorough conviction standard, the District Court's decision is well supported. Demonstration of actual reduction to practice requires proof—here by a preponderance of the evidence before the Board—of two general elements: (1) the grass-cutting machine must have been embodied in a physical or tangible form containing every essential element of the invention as defined in the counts in interference;[14] and (2) the machine must be shown to have operated effectively for its intended use. *See*, C. Revise & A. Caesar, Interference Law and Practice §§ 31–32, at 395–397 (1940).

The Board of Patent Interferences found, on the first issue, that sufficient proof had been submitted to conclude that the "flying" lawnmower was actually built in the spring of 1960 and that it contained, at that time, "every feature of the invention as defined in the counts." On the second issue, however, the Board found that the junior party had failed to prove that the machine operated "effectively" or "satisfactorily." Greatest emphasis was placed on the fact that the inventors continued after their 1960 tests to experiment with a great number of different component parts. On the request for reconsideration the Board again stated that, while some grass was cut in 1960, those experiments offered the inventors nothing more than encouragement and reason to predict that "the invention would probably be successful if and when it could be put to practical use." Emphasizing its reliance on Elmore v. Schmitt, 278 F.2d 510, 47 CCPA 960 (1960), the Board held that reduction to practice required more than "a mere basis for prediction." The District Court took issue with the Board both as to its factual conclusions and with respect to its reli-

---

12. This is not, therefore, a case in which it could fairly be argued that the litigants had been cut off from their right to a trial on genuine unresolved factual issues. *See, e. g.*, Sartor v. Arkansas Nat. Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944).

13. We hold here only that summary judgment was not improper on the reduction to practice issue. The peculiar procedural stance of the two subsidiary issues concerned with patentability will be discussed in Part IV of this opinion.

14. *See* note 1 *supra.*

ance on *Elmore*. We agree with the court on both counts.

The pertinent deposition and exhibit evidence can be briefly summarized. The two inventors, John Cody and George Sites, were not inventors by trade and worked on their machine only during their off-work hours. Cody was an agricultural pilot and was able to secure space in a hangar at the airport in which they could work on the mower and store their tools and equipment. Because neither man had a great deal of money, many parts of the machine were made out of discarded scrap metal and any other readily available materials. The numerous propellers experimented with, for instance, were all handcarved,[15] and a washtub was used as the mold for forming the fiberglass shell which was to function as the housing.

Five witnesses, including the inventors, testified to having seen the experiments conducted in the spring or fall of 1960. Cody testified that his mower did cut grass in the experiment conducted in a field near the airport in the spring of 1960. He stated that "the machine flew and operated satisfactorily; * * * the machine did fly and did operate; * * * we were very pleased with the results of it." In addition to the airport trial, Cody stated that another successful test was conducted at a farm in the fall of 1960. His testimony also includes references to some of the problems they confronted. He indicated that they were not getting a cut over the full length of the blade but that the machine was cutting more toward the center of the blade. This problem, and to a lesser extent a torque problem, were subsequently corrected by the addition of baffles within the housing. Although he listed several other changes, he maintained that "there were no major alterations. Basically, it was the same machine."

Cody was the only deponent to be cross-examined at any length by appellants' counsel. He was asked whether his propeller blew the air straight downward against the surface or whether it sent the air off the tips of the propeller by centrifugal action. Cody responded that he did not know how the air moved around inside the housing and that, while he did not design the propellers with any particular aerodynamic result in mind, he concluded that the air most probably moved both downward and off the tips. Counsel for appellants addressed no questions to Cody regarding the success of the grass-cutting experiments.

George Sites also testified that the device made a "fair swath" and that the engine would "pick up [the housing] and it would cut grass. It wasn't as efficient as what we wanted and wasn't what we would want to put on the market." He, too, spoke about the addition of baffles to improve the efficiency of the machine by allowing it to cut a wider area, and about other improvements made after the 1960 experiments. He was not cross-examined.

John Neill, a crop duster who was invited to watch the airport experiment, testified as follows:

> "The machine actually, I thought the first machine flew just as well as the one they built today. It wasn't as near as good looking in appearance * * * [T]he lawnmower did fly good and it performed good and it did cut good.

> "It definitely was cutting grass. Like I say, I think the first one did as good a job, or a better job, as some of the ones he produced later. * * * *"

He was not cross-examined as to the details of his observations at the airport.

Another witness to the spring, 1960, experiment, Daniel Martin, testified that he saw a "machine on the airport cutting grass that wasn't touching the ground." Although he was acquainted with Cody

15. Appellee Cody testified that the propellers were built "out of laminated wood and rasp and sandpaper and everything but teeth and fingernails." He also testified that the handlebars were constructed out of excess steel tubing found at the airport.

and had done photographic work for him on several occasions, his presence at the airport at the time of the experiment was occasioned by some work he was then performing for the local chamber of commerce. He was so "astonished" at what he saw that he took a closer look in order to verify that it was indeed a flying lawnmower.

The final corroborating witness was James Howard Agerton, Sites' father-in-law, who testified that he viewed experiments in the fall of 1960 at his farm and that, at that time, the machine was cutting grass. Substantial tangible evidence was also introduced, including a written description of the machine which was signed by the inventors and witnessed by a third party in February, 1960; photographs of many of the parts experimented with over the period of development; cancelled checks, invoices and sales slips for the various items which were purchased and used in the machine; and several of the essential parts of the original mower.

We are unable to see how this evidence can be said to fall short of the required proof of reduction to actual practice.[16] Of course, as appellees readily admitted, the lawnmower was not commercially marketable in 1960. But it is well established that marketability is not the crucial test. *See, e. g.*, Kravig v. Henderson, 362 F.2d 1015, 1023, 53 CCPA 1534 (1966); Toledo Scale Corp. v. Westinghouse Elec. Corp., 351 F.2d 173, 182 (6th Cir. 1965). Nor is the weight of appellees' proof mitigated because the original machine was crudely constructed or because subsequent refinements were undertaken to improve its efficiency. *See, e. g.*, Land v. Regan, 342 F.2d 92, 98, 52 CCPA 1042 (1965); Farrand Optical Co. v. United States, 325 F.2d 328, 332–333 (2d Cir. 1963).

Appellants' primary contention throughout these proceedings on the issue of priority has been that the machine built and demonstrated in the spring of 1960 could not possibly have operated effectively for its intended use because it lacked baffles. Since their contentions regarding the necessity of baffles also stand at the heart of the issues of patentability subsequently to be considered, it may be helpful to explain their position more fully. Appellants assert that there is a critical difference between their invention and appellees'. Their invention uses a "radial impeller," designed to shoot the air out around the edge of the housing by centrifugal force, thus creating a vacuum inward of the housing wall which holds the blades of grass in an upright position in the path of the cutting blade. Appellees' device so appellants contend uses instead a mere propeller which in the process of lifting the housing blows the air straight down and consequently flattens the grass so that it cannot be cut. To counteract this effect it is argued appellees found it necessary to install deflectors or baffles inside the housing to direct the air flow off of its downward course and more toward the sides of the housing. Appellants claim that until such time as those baffles were initiated into the device the machine physically could not perform its intended task.

Appellants have however introduced no evidence in support of their aerodynamic thesis and on the one occasion when they broached the subject in the course of briefly cross-examining Cody they were told by him that his experience did not square with their theory. Second, all of the evidence on the question whether the machine cut grass points only one way, and it is clear and undisputed that on the occasion of the first demonstration there were no baffles in the housing.[17]

16. Although lack of adequate corroboration of the inventors' self-serving assertions is frequently a central issue in patent interference disputes, on the basis of the fully developed record in this case we cannot take seriously appellants' argument that the allegations were not ade- quately corroborated. *See generally* III C. Revise & A. Caesar, Interference Law and Practice (1947).

17. Appellants have suggested that those who testified that they saw the machine cutting grass only thought that the grass

Third, appellees' original patent application provides an explanation which is consistent with the evidence. According to their theory—and they admit to a lack of complete understanding of the circulation patterns within the housing—the whirling motion of the propeller creates a partial vacuum at the vortex of the machine, lifting the grass in the more central portion of the surface beneath the housing but blowing it flat around the rim. The addition of baffles, in addition to correcting the torque problem, deflects the air in such a manner that these blades nearer the rim are shielded from the blast of air so that they also may be cut. This brief explanation is consistent with the actual experience that, without the baffles, the machine cut a relatively narrower swath. Given this articulation of the machine's operation, the baffles were not essential to a showing of reduction to practice but only operated to improve the machine's efficiency.

Finally, in conjunction with our conclusion sustaining the District Court's finding against the Board on the facts, we also agree with its determination that the Board had misapplied the only case cited in either of its two opinions—Elmore v. Schmitt, *supra*. The invention there was a binary counter which had utility as a component part when used in conjunction with computers, radar equipment, Geiger counters, or television circuits. The invention was tested in a laboratory experiment but was never tested in conjunction with any one of the devices named. Until such time as the device was tried out under operational circumstances, the court held that the requirement that an invention must be demonstrated under actual working conditions had not been met. Laboratory tests provided no more than a basis for predicting that the invention would be

successful when "put to some specific practical use." *Id.* at 513.

The invention in this case, unlike the device in *Elmore*, was a complete unit possessing demonstrable utility. It *was* demonstrated under actual operating conditions which could in no way be analogized to mere laboratory experiments offering only a hope of future worth. Although the machine was crude and lacking in efficiency, it did function satisfactorily for its intended purpose. We conclude that under appropriate legal standards the testimony in this record is such that it amply supports a thorough conviction that the Board erred in failing to find that appellees had shown reduction to practice by a preponderance of the evidence.

## IV

Having concluded that appellees were the original inventors of the device in question, we are now faced with the question of whether that machine is patentable to them. Appellants have claimed throughout that, under the patentability rubric, appellees cannot prevail for two reasons: (1) the lawnmower as described in the pertinent counts in interference is not an operable device, 35 U.S.C. § 112; and (2) appellees are barred from receiving a patent because their amended application was filed outside the statutory one-year period, 35 U.S.C. § 102(b). Before we may resolve these matters on the merits it is essential that we find that they fall within the jurisdiction of this court and the District Court in reviewing interference rulings.

▆ First, it will be helpful to trace briefly the manner in which the issues were handled by the Patent Office and the District Court in this case. The question was first raised by appellants

---

had been cut. They postulated that, in reality, the force of the downward blast of air may have merely flattened the blades of grass creating the impression that they had been severed. No evidence

whatsoever has been introduced in support of this speculation and the theory was not explored in the course of cross-examination. We see no reason to credit it here.

in September, 1965, shortly after the interference was declared and before any evidence had been submitted in the proceeding. Pursuant to the Patent Office Rules of Practice, 37 C.F.R. § 1.231 (1971), appellants filed a motion to dissolve the interference on the two grounds stated above. The motion was considered by a Primary Examiner who concluded against appellants on both issues and denied the motion. The Board of Patent Interferences, in its initial opinion, briefly outlined the Examiner's findings but did not comment on them one way or the other. Resolution of the patentability claims was unnecessary to the Board's decision since it found, based on the priority of reduction to practice issue, that appellees were not entitled to a patent. In the District Court, after reversing the Board on the question of priority, the trial judge stated that, in view of the fact that the patentability contentions were not fully explored by the Board, he did not find it appropriate to examine that aspect of the case.[18]

We find that the Supreme Court has definitely resolved this question in a manner contrary to the District Court's conclusion. In Hill v. Wooster, 132 U.S. 693, 10 S.Ct. 228, 33 L.Ed. 502 (1890), on review of a suit in equity under the predecessor of the review statute in issue in this case, the Court broadly held that

"[N]o adjudication can be made in favor of the applicant, unless the alleged invention for which a patent is sought is a patentable invention. The litigation * * * cannot be concluded by solely determining an issue as to which of [the parties] in fact first made [the invention]."

*Id.* at 698, 10 S.Ct. at 230.

The wider implications of that ruling were circumscribed in Sanford v. Kepner, 344 U.S. 13, 73 S.Ct. 75, 97 L.Ed. 12 (1952). There the party who had *lost* before the Board of Patent Interferences claimed in the district court that the device was not patentable to the party who had prevailed before the agency. The district court refused to consider the issue and the Court's opinion sustained that abstention on the ground that *Hill v. Wooster* did not require that every issue of patentability raised in a *de novo* proceeding must be resolved. Rather, the principle of that decision was said to be that only in the circumstance in which the *losing* party before the Board prevails in the district court on the issue of priority does the patentability issue become pertinent.[19]

---

18. Cody v. Aktiebolaget Flymo, 306 F. Supp. 728, 729 (D.D.C.1969):

"Other defenses are urged by Flymo supporting the rationale of the Board's decision but these were not developed in any detail before the Board. It is not for the Court in this proceeding to re-examine all aspects of the Board's decision but only to review the Board's ruling on the central issue of priority. * * * *"

19. The reasoning of both decisions relied heavily on the terms of the statute which authorized *de novo* review of interference rulings. Of particular pertinence was the language, contained in the original statute and carried over into the law in its present form, that if the dissatisfied party succeeds in the district court "such adjudication * * * shall authorize the commissioner to issue such patent, on the applicant filing in the patent office a copy of the adjudication, and otherwise complying with the requirements of law."

16 Stat. 205, § 52 (1870). *Compare* 35 U.S.C. § 146 (1964). Under such circumstances, as the Court in Hill v. Wooster noted,

"[A] determination of [the priority] issue alone, in favor of the applicant, carrying with it, as it does, authority to the commissioner to issue a patent to him for the claims in interference, *would necessarily give the sanction of the court to the patentability of the invention involved.*"

132 U.S. at 698, 10 S.Ct. at 230 (emphasis supplied). *See also* Sanford v. Kepner, 344 U.S. at 15, 73 S.Ct. at 76 ("judicial authorization of issuance implies judicial sanction of patentability"). As the distinction drawn by the cases makes clear, no such implication arises when the district court merely affirms the Board's decision.

This view, that the Patent Office is required to issue a patent to the successful plaintiff in an interference suit, has been disputed in other contexts. *See* Jeff-

Since that is precisely the circumstances in which the parties found themselves in this case, the District Court should have passed on the merits of the patentability claims. *See, e. g.,* General Motors Corp. v. R. E. Dietz Co., 137 U.S.App.D.C. 100, 420 F.2d 1303 (1969); Boyce v. Anderson, 405 F.2d 605, 608 (9th Cir. 1968); Sperry Rand Corp. v. Bell Tel. Labs., 208 F.Supp. 598, 602 (S.D.N.Y. 1962), appeal dism'd, 317 F.2d 491, 493 (2d Cir. 1963).

Ordinarily, with the issues in this posture, we would remand the case to the District Court in order that it might consider the evidence on the patentability question in the first instance. *See* Tidewater Patent Development Co. v. Gillette Co., 273 F.2d 936, 942 (4th Cir. 1960). Here, however, both parties have pressed this court to resolve these questions. Indeed, appellants urge most strenuously that we do so. Furthermore, neither party appears to be of the view that the record is inadequate to this end. Finally, we are fortified in our inclination to reach these questions on their merits by the fact that both contentions appear to revolve around—and, we find, are controlled by—our disposition regarding the nonessentiality of baffles to appellees' invention.

■ Appellants' first claim, based on 35 U.S.C. § 112, is that the machine as appellees have designed it—using a propeller rather than an impeller—is inoperable without baffles, and that the counts in interference do not include this critical element. While it is true that appellees' original application did refer to the baffles and that the amended claims setting up the interference do not,[20] this consideration is immaterial in view of the fact, which we have found to be fully sustained on this record, that the machine operated effectively without

them. The baffles merely increased the eficiency of the machine. Furthermore, there can be no doubt, as the Primary Examiner found, that the counts in interferences are readable on the invention as disclosed by appellees.

■ Appellants' second claim is that appellees are barred from receiving a patent because "the invention was patented or described in a printed publication in this or a foreign country * * * more than one year prior to the date of the application * * *." 35 U.S.C. § 102(b). Again their contention stands or falls on the strength of their assertion that baffles were an indispensable element of appellees' original application. The thread of their argument is that— for the same reasons relied on in their claims on the operability and priority issues—the amended application filed in 1964 in order to set up an interference, which made no reference to baffles, constituted a *new device.*

If that were the case, then the "date of application" referred to in the statute would be the date of the amendment. Appellees would then be barred from obtaining a patent because a period of more than a year separated the filing of the amendment and appellants' receipt of a Belgium patent covering the lawnmower (March 30, 1962), and the publication of an article disclosing the invention in a Swedish technical journal (November 1, 1962). *Sée* Package Devices, Inc. v. Sun Ray Drug Co., 301 F.Supp. 768, 776–778 (E.D.Pa.1969), aff'd, 432 F.2d 272 (3 Cir. 1970), cert. denied, 401 U.S. 956, 91 S.Ct. 977, 28 L.Ed.2d 239 (1971). What we have said above regarding the inconsequentiality of the baffle structures is dispositive of this issue as well. Since the amended application simply did not describe a new device, the critical date for determining whether statutory

rey Mfg. Co. v. Kingsland, 86 U.S.App. D.C. 13, 179 F.2d 35 (1949); Glass v. De Roo, 239 F.2d 402, 44 CCPA 723 (1956). Since Hill v. Wooster, and Sanford v. Kepner are controlling here, we have no occasion to consider the more general question regarding the extent of

the Patent Office's authority in its *ex parte* proceedings to decline to issue a patent following a successful attack in the district court on a ruling of the Board of Patent Interferences.

20. *See* note 1 *supra.*

bars exist is the date of the original application. It is not contended that, viewed as of that date, the application is subject to any such infirmity.

Therefore, it is our conclusion that, at least insofar as any of the issues raised here are concerned, appellees' invention is patentable. Having concluded that appellees also met their burden in establishing prior reduction to practice, the judgment of the District Court is

Affirmed.

CHRISTENSEN, District Judge (dissenting):

I concur with most of what has been stated in the prevailing opinion concerning burdens of proof and the substantive rules of patent law involved; but I must dissent from its application of the rules of summary judgment. It seems likely that the decision will prove more significant as a precedent in the latter aspect than in the former, for the substantive law involved is perceptively analyzed, and accurately stated in accordance with the prevailing view, while if the decision is widely followed with respect to the propriety of summary judgment the trials of numerous types of cases which heretofore have been thought to involve questions of fact not susceptible to summary disposition will be rendered unnecessary.

The prevailing opinion, before considering the substantive issues of priority and patentability, deals with two preliminary questions: the first as to the burden of proof in the trial *de novo* before the district court; the second being defined as follows: "Given that standard of review, can disposition, short of a full evidentiary hearing, by way of summary judgment ever be appropriate in a case in which the Board's conclusion is to be overturned?" Agreeing with the statement of the first question and its

answer, I suggest that the second should not be based upon abstract ultimates but should consider whether under the circumstances of this particular case summary judgment could be granted without unacceptable violence to the governing concept and principle of summary judgment. In my opinion, in view of that concept and principle, the entry of summary judgment constituted error in light of the uncertain nature of the proof, varying inferences which could be drawn by reasonable minds, the absence of documentation on the critical question of when baffles were added, the presumptive correctness of the Patent Office action,[1] Cody's heavy burden of proof before the district court[2] especially on a motion for summary judgment, the lack of a full exploration of the facts because summary judgment denied an opportunity to develop them fully at a trial *de novo*, and the limited office of summary judgment except where it is clear that there are no genuine issues of material fact. Without deciding that summary judgment on an appeal from the Board's determination should never be granted it is believed that on the record before us the required "thorough conviction" could not be properly entertained as a matter of law and without the determination of the court as a fact finder.

Fox v. Johnson & Wimsatt, 75 U.S. App.D.C. 211, 127 F.2d 729 (1942), on the basis of which the crucial problem of summary judgment is resolved in the prevailing opinion, is distinguishable from the case at bar. Nonetheless, it may epitomize my point of departure as it seems based upon two assumptions which do not represent the prevailing, and what I think is the better, view today: (1) that if both sides file motions for summary judgment each concedes that there is no genuine issue as to any material fact and in effect consents to

---

1. *See* the late case of Pro-Col Corp. v. Commissioner of Patents, 141 U.S.App.D.C. 142, 436 F.2d 296 (1970).

2. *E. g.*, Morgan v. Daniels, 153 U.S. 120, 14 S.Ct. 772, 38 L.Ed. 657 (1894);

United States v. Szuecs, 100 U.S.App.D.C. 24, 240 F.2d 886 (1957); *see* Esso Standard Oil Co. v. Sun Oil Co., 97 U.S.App. D.C. 154, 229 F.2d 37, cert. denied, 375 U.S. 973, 76 S.Ct. 1027, 100 L.Ed. 1491 (1956).

a waiver of trial; (2) that where there is no dispute as to circumstantial facts, a case can be decided on summary judgment even though different inferences on crucial matters might be drawn by reasonable minds from the established facts. Motion of both parties for summary judgment did not convert pre-trial proceedings into a trial nor waive the right to trial if the case could not otherwise be resolved summarily, for a party may concede that there is no issue of fact if his legal theory is accepted and yet maintain that there is genuine dispute as to material facts if the opponent's theory is adopted. American Fidelity & Cas. Co. v. London & Edinburgh Ins. Co., 354 F.2d 214 (4th Cir. 1965). Summary judgment is precluded by conflicting inferences drawable by reasonable minds from undisputed material facts which if settled against the moving party would deny him a judgment. Equal Emp. Op. Com'n v. United Ass'n of Journeymen and Apprentices of Plumb., etc., 427 F.2d 1091 (6th Cir. 1970); Columbus Services v. Preferred Building Maintenance, 398 F.2d 80 (6th Cir. 1968); Frey v. Frankel, 361 F.2d 437 (10th Cir. 1966); S. J. Groves & Sons Company v. Ohio Turnpike Commission, 315 F.2d 235 (6th Cir. 1963). This is not an esoteric principle, but one that pervades the entire law with reference to the propriety of withdrawing issues from fact finders. Thus, a pleading must be considered as against a motion for summary disposition in the light most favorable to the pleader and with all reasonable inferences to be resolved in his favor; a motion for a directed verdict or for judgment notwithstanding a verdict is confronted with similar intendments and in examining the sufficiency of evidence to support a judgment on appeal, appellate courts consider evidence and inferences that may fairly be drawn therefrom in the light most favorable to the party who prevailed before the fact finder. A motion for summary judgment presents issues of law, not of fact, and the purpose of Rule 56, F.R.Civ.P., is to permit expeditious disposition of cases where no substantial issue of fact is presented for determination; it is not intended that litigants shall be deprived of their right to a full hearing before a fact finder free to draw reasonable inferences among conflicting ones if any material issue of fact is tendered. See Black, Sivalls & Bryson, Inc. v. National Tank Company, 445 F.2d 922 (10th Cir. 1971). The confining of judgments within such limits seems to me to be an enhancement of the judicial process rather than its frustration.

I believe there were material issues of fact with reference to the vital questions of the time and sufficiency of reduction to practice which were adequate to preclude summary judgment had the decision of the Board been before the court without any presumption or intendment in its favor; under the rule that its decision should be accepted as controlling unless on trial *de novo* the court as fact finder entertains thorough conviction to the contrary, it seems inappropriate and improper on the facts of this case to have resolved the questions on summary judgment.

No hard and fast rule as to the proof essential to show reduction to practice can be laid down, and this presents the principal difficulty in ruling on such matters by summary judgment. The decision is principally one of fact in light of the applicable principles of law. It has been said that "[T]he exact extent of testing necessary to effect a reduction to practice is a matter which must be determined by the circumstances of each particular case and the nature of the device involved." St. Pierre v. Harvey, 233 F.2d 337, 43 C.C.P.A. 918 (1956).

My reading of the cases indicates that the Patent Office did not so misconceive the essential elements of a reduction to practice that its decision as to the law was clearly erroneous and thus reversible by summary judgment apart from any question of fact. The trial court's memorandum perceptively analyzed the general requirements not inconsistently with the authorities; but the court ultimately tended to reduce the question to an overly

simple one of whether the Cody machine was demonstrated to cut grass at all, which question it dispositively answered in the affirmative. On the other hand, the Board of Patent Interferences emphasized the requirement of practical demonstration in terms of satisfactory operation. Confirming its decision on reconsideration, however, the Board rested its conclusion on the proposition that "* * * just cutting grass, without regard for its effectiveness, is insufficient proof of the practical utility of the machine for its intended purpose under ordinary working conditions. Thus, Cody *et al.* did not sustain their burden of proof and did not prove actual reduction to practice of the invention in issue."

Despite the variant expressions of the requirements, we think that neither the Board nor the court essentially misconceived the governing law—which, on the one hand, would render insufficient as reduction to practice a mere literal cutting of blades of grass, however few or insignificant and irrespective of any practical utility in relation to its intended purpose, and yet, on the other hand, recognizes there can be a reduction to practice by an embodiment which operates imperfectly or crudely as long as it demonstrates some substantial degree of practical utility for its intended purpose. It does not appear that the decision of the Board of Patent Interferences was premised on such a definable error of law as to free the district court from

applying the "clearly erroneous" or "thorough conviction" test. *See* Stieg v. Commissioner of Patents, 122 U.S. App.D.C. 361, 353 F.2d 899 (1965).

Yet, if we assume that the Board erred in a too rigid or limited definition of the reduction to practice requirements, summary judgment would not be authorized nonetheless since only if there were no facts in issue which would have precluded summary judgment under a proper definition or standard for reduction to practice could the judgment be sustained.

After a careful reading, the transcript of the testimony before the Board is convincing to me that reasonable minds could differ as to its sufficiency to show reduction to practice under the proper standards. The testimony tending to support a reduction to practice is in many respects vague and unsatisfactory. In its essential aspects the proof rests importantly upon the testimony of Cody, he being a highly interested party. Evidence as to the time baffling was added to the device, which the testimony suggests was originally of dubious utility for its intended purpose, is not documented, consisting of a rather casual reference.[3] In addition, the embodiment itself had not been preserved for inspection. The fact finder could consider these and other circumstances in arriving at a judgment whether the junior party had satisfactorily met his burden. *See generally* Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 64 S.Ct. 724,

3. "54. About when was it that you and John installed the baffles on the machine that you're talking about?

A. That was in the fall or winter, I believe it was. It was after John's season. The project wasn't worked on right during the heart of the season. John wasn't in this area at that time and I believe at that time, too, I was still in the Guards and I know I went to summer camp that year. * * *

56. What sort of baffles did you install in the fall of '60?

A. They were some that was attached to the spider and then some attached to the inside of the housing. They were air deflectors to correct the torque of the machine.

57. The ones that were attached to the spider, what were they for?

A. For torque.

58. And the ones attached to the housing, what were they for?

A. Partially for torque, too, and to let the very tips of the cutting blade out.

59. Did it accomplish that?

A. Yes, it did, but still again it still wasn't as efficient well, it was efficient but it wasn't what we wanted. It was efficient to the point where it would cut grass okay but I've always been a person that if it's worth doing it's worth doing it right and we always strived for the best."

88 L.Ed. 967 (1944); 4 Revise and Caesar, Interference Law & Practice, Chapter XXXIII § 641 et seq. (1948). *See also* Miessner v. Hoschke, 76 U.S.App. D.C. 343, 131 F.2d 865 (1942), and Jepson v. Egley, 231 F.2d 947, 43 C.C.P.A. 853 (1956), concerning the corroboration required in interference proceedings. *Cf.* Interchemical Corp. v. Watson, 145 F.Supp. 179 (D.D.C.1956), aff'd, 102 U.S.App.D.C. 149, 251 F.2d 390 (1958). Cody calls attention to the fact that Flymo did not cross-examine the witnesses before the Board and thus failed to clarify any questions left by their direct testimony. I can accept this as neither shifting the burden to the senior party or relieving Cody of his, nor as requiring the Board as the fact finder to accept without question the testimony before it. This is especially so in view of the interest of the party testifying and the long period which had elapsed between the time of the testimony and the event in question.

If the trial court were the fact finder, as indeed it would be if the summary judgment had been set aside and the case permitted to proceed to trial, there may have been sufficient factual question in the evidence already before it from the Board hearing in the absence of other evidence to permit a thorough conviction in favor of Cody despite the Board's determination to the contrary. But other evidence at the trial, or a different but permissible appraisal of the record by the fact finder could well result in an absence of such conviction on its part.

In Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), the Supreme Court emphasized that summary judgment under Rule 56 can be granted only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is and where no genuine issue remains for trial, and that the purpose of the rule is not to cut litigants off from the right to trial if they really have issues to try (citing

Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). *See also* Edwards v. Mazor Masterpieces, Inc., 111 U.S.App.D.C. 202, 295 F.2d 547 (1961); Vale v. Bonnett, 89 U.S.App.D.C. 116, 191 F.2d 334 (1951); Dewey v. Clark, 86 U.S.App. D.C. 137, 180 F.2d 766 (1950).

The Court was of the view in *Poller* that summary procedures should be used sparingly in complex antitrust litigation. I think that policy considerations, although essentially for other reasons, require that same view here, where the "thorough conviction" as a foundation for overturning agency action could rarely be entertained without according opportunity for development of facts beyond the record which led the agency to its presumptively correct conclusion,[4] and a weighing of the testimony before the Board either with or without supplementation and the reasonable inferences to be drawn therefrom.

For the reasons stated I would remand the case to the district court for findings of fact, conclusions of law, and judgment after trial.

---

4. *Cf.* Stieg v. Commissioner of Patents, 122 U.S.App.D.C. 361, 353 F.2d 899 (1965).